Argued and submitted November 26, 1997, affirmed June 3, petition for review denied October 28, 1998 (327 Or 621)

# STATE OF OREGON,
*Respondent,*

*v.*

# CURTIS FLOYD BALDEAGLE,
*Appellant.*

## (95-11-38375; CA A93724)

961 P2d 264

Andy Simrin, Deputy Public Defender argued the cause for the appellant. On the brief were Sally L. Avera, Public Defender and Eric M. Cumfer, Deputy Public Defender.

Ann Kelly, Assistant Attorney General argued the cause for the respondent. With her on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Before Riggs, Presiding Judge, and Landau and Wollheim,* Judges.

LANDAU, J.

---

\* Wollheim, J., *vice* Leeson, J., resigned.

## LANDAU, J.

In this criminal case, defendant appeals a judgment of conviction on two counts of sexual abuse in the first degree, raising two assignments of error: (1) that the trial court erred in permitting the state to prove that he committed the crimes on dates different from those stated in the indictment; and (2) that the trial court erred in failing to grant a motion for mistrial based on juror misconduct. We affirm.

Defendant's convictions stem from events concerning one of his daughters. In March 1995, defendant's eight-year old daughter wrote in her journal that defendant had "been nasty" to her sister, defendant's ten-year old daughter, while her sister was taking a bath. A schoolteacher saw that journal entry and reported it to the police, who investigated the allegation. As a result of that investigation, defendant was charged with two counts of sexual abuse in the first degree, one charging that defendant had touched his daughter's breasts, and one charging that defendant had touched his daughter's mouth by "french kissing." Both events were alleged to have occurred on or between January 1, 1995, and March 31, 1995.

Defendant was tried by jury on May 28 and 29, 1996. The court instructed the jury not to talk to third parties about the case and also told the jury that the court had the power to hold jurors in contempt of court and to jail them for talking to third parties about the case. On the first day of trial, the victim testified that defendant had kissed her and put his tongue in her mouth, but she pushed him away. She testified that, on another occasion, defendant had dried her off after she got out of the bath and that he touched her breasts and between her legs while telling her that she should not let anyone touch her in those areas. He then asked the victim to "help me stop this thing." The victim believed that those events occurred when she was nine or ten years old. Detective Whalen, who investigated the allegations, also testified on the first day of trial. In the course of the investigation, defendant stated to Whalen that the french kissing episode and the bath episode occurred in September or October of 1994. Defendant told the detective that during the bath episode, he had dried his daughter, commenting that her breasts

were getting bigger, telling her not to let boys touch her breasts as he dried her breasts, and telling her not to let boys touch between her legs as he dried between her legs. Defendant told the detective that he had french kissed his daughter to demonstrate what a french kiss was, so she would know when boys french kissed her. On the second day of trial, Dr. Lorenz, a pediatrician from the CARES program, testified concerning her examination of the victim. The victim indicated during the CARES interview that the french kiss occurred in March 1995.

The trial court instructed the jury that the state was required to prove that the crimes occurred between April 1, 1994, and May 31, 1995. The jury deliberated for less than 30 minutes, returning a unanimous verdict on the charge involving french kissing and an 11-1 verdict on the charge involving the bath episode.

The following morning, the trial court received word from another judge's chambers that Ms. Jeppesen, a woman who had been a prospective juror in the trial, reported overhearing one of the jurors discussing the case on the morning of May 29. The court then interviewed Jeppesen on the record. Jeppesen was a prospective juror for defendant's trial, but was not chosen for the panel on May 28. As she waited for the MAX light rail train into Portland on the morning of May 29, she recognized one of the members of the jury also waiting for the train. He asked her if she had been picked for a case yet and told her that he was picked for a sexual assault case. After boarding the train, Jeppesen heard the juror ask a young couple on the train whether they had been picked for a case. They replied that they were not on jury duty and asked the juror about the case on which he was serving. The juror stated that it was a sexual assault case, and they stated that they knew someone who was on trial for sexual assault, naming defendant. The juror told them that he was on that case. The couple told the juror: "Oh, he's just wrong. That man is just wrong." The couple identified themselves as friends of the victim's family. The juror said: "Yeah, I can just tell he did it. I can just tell he's in the wrong. You can tell by looking at him." The court then determined that the juror in question was Mr. Eggers.

The court, in the presence of the prosecutor and defense counsel, subsequently questioned Ms. Webb, the foreperson of the jury. Webb stated that if Eggers had made any comments concerning outside knowledge of the case, she could not recall them. She said that Eggers was talkative and adamant, that he said inane things, that he did not appear to be very bright, and that she would "tune him out" and not pay much attention to him. Defendant moved for a new trial based on juror misconduct. The trial court denied the motion, finding that

> "juror Eggers did not communicate to the other jurors his contact of May 29, 1996, with persons on the light rail train, [and that] the extraneous contact by juror Eggers did not materially affect substantial rights of the defendant and the contact was beyond a reasonable doubt harmless to the defendant."

On appeal, defendant first asserts that the trial court incorrectly instructed the jury that the state was required to establish that the crimes were committed between April 1, 1994, and May 31, 1995. Defendant argues that, because the indictment alleged that the crimes occurred between January 1, 1995, and March 31, 1995, defendant could have been convicted of crimes that were not charged in the indictment. Defendant argues that the expansion of the dates effectively amended the indictment in substance and that the court had no authority to make such an amendment.

ORS 135.717 provides:

> "The precise time at which the offense was committed need not be stated in the accusatory instrument, but it may be alleged to have been committed at any time before the finding thereof and within the time in which an action may be commenced therefor, except where the time is a material element in the offense."

Defendant does not argue that time is a material element of the crime of sexual abuse. In fact, we have held that it is not. *See State v. Daugaard*, 142 Or App 278, 283, 921 P2d 975 (1996). Defendant argues that the instruction nonetheless was erroneous because the jury could have based his convictions on crimes other than the ones charged in the indictment. Defendant relies on *State v. Sohn*, 107 Or App 147, 810

P2d 1337 (1991), for the proposition that allowing evidence that an offense occurred on a date other than one alleged in the indictment is not permissible.

In *Sohn*, the defendant was charged with theft from her employer allegedly occurring over a six-week period in which she "pa[id] herself for more hours than she was entitled to be paid[.]" *Id.* at 149. At trial, the state presented evidence that the theft actually occurred over a three-month period, and the jury was instructed that it could find that the theft occurred over that three-month, rather than the six-week, period. *Id.* We stated that "there is no authority for a trial court to amend the pleadings to conform to the proof in a criminal case" and concluded that "the instruction allowed the jury to convict defendant for acts outside those which provided the basis for the grand jury's accusatory instrument." *Id.* at 150. Thus, *Sohn* does stand for the proposition that defendant describes.

Since we decided *Sohn*, however, the Oregon Supreme Court addressed the same issue in *State v. Long*, 320 Or 361, 885 P2d 696 (1994), *cert den* 514 US 1087, 115 S Ct 1803 (1995). In *Long*, the indictment alleged that the crime of sodomy had occurred between June 1, 1982, and April 30, 1983, but evidence at trial showed that the crime occurred on April 22, 1984. *Id.* at 363. The defendant argued that it is impermissible to deliver a jury instruction that expands the dates alleged in the indictment. *Id.* at 366. The court disagreed, holding that, because the date alleged in the indictment was not a material element of the crime, the state was not required to allege a date at all. The court concluded that the only question was whether the defendant had suffered prejudice to his defense by the change of dates. *Id.* at 368-69.

■ In light of the more recent Supreme Court decision in *Long*, *Sohn* no longer can be regarded as good law. We note that we have suggested in *dictum*, in *State v. Loewen*, 141 Or App 144, 147, 917 P2d 532 (1996), that expanding the dates beyond those alleged in the indictment is not permissible. In light of *Long*, however, we must disavow that *dictum*. If the date of a crime is not a material element of the offense, variance between the date alleged and the date proven is not a

fatal flaw, unless the date proven is outside the statute of limitations, or the defendant is prejudiced by the variance.

■ We turn then to the question whether defendant was prejudiced by the change of dates. Defendant does not argue that he was prejudiced, and we are unable to conclude that he could have been prejudiced. The information that the crimes might have been committed several months before the dates alleged in the indictment was provided by defendant himself, so he scarcely could say he was not on notice of the dates involved. Nor is there any possibility that the grand jury actually indicted defendant for different offenses from those for which he was convicted. The victim's testimony and defendant's confession both clearly described the same events, with no significant variation between the stories. We conclude that defendant was not prejudiced by the variation between the dates alleged in the indictment and the evidence that the crimes might have occurred several months earlier. The trial court therefore did not err in instructing the jury that it could find defendant guilty based on the earlier events.

■ Defendant next argues that the trial court erred in denying his motion for a new trial based on juror misconduct. We review a trial court's decision concerning whether to grant a new trial based on juror misconduct for abuse of discretion. *Ertsgaard v. Beard*, 310 Or 489, 496, 800 P2d 759 (1990). Defendant contends that the court abused its discretion in denying a new trial because Eggers sought out contact with third parties in violation of the court's instruction, failed to report the contact, and actively participated in jury deliberations after having formed an opinion of defendant's guilt before all of the evidence was received. Defendant contends that the juror's exposure to outside information about the case, as well as his misconduct in discussing the case and failing to report the discussion to the court, violate his right to an impartial jury and right to confrontation guaranteed by Article I, section 11, of the Oregon Constitution, and the Sixth Amendment to the United States Constitution.[1]

---

[1] Article I, section 11, of the Oregon Constitution, provides, in part, that "In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury * * * and * * * to meet the witnesses face to face."

In *State v. Jones*, 126 Or App 224, 868 P2d 16 (1994), we discussed the type of juror misconduct that could entitle a party to a new trial:

> "There is a strong policy in Oregon to protect jury verdicts from attack. Only limited kinds of juror misconduct justify a new trial. The kind of misconduct that will be considered an attack on a verdict is misconduct that is extrinsic to the communications between jurors during the deliberative process or that amounts to fraud, bribery, forcible coercion or any other obstruction of justice that would subject the offender to contempt of court or criminal prosecution."

*Id.* at 228. If a juror has engaged in any of the limited forms of misconduct described, the verdict may be overturned only if the misconduct had prejudicial effect.

For example, in *Moore v. Adams*, 273 Or 576, 542 P2d 490 (1975), it was alleged that one of the defendant's witnesses communicated with members of the jury during a recess in the trial about the merits of the case. The trial court took testimony from various witnesses other than the jurors and concluded that there was no evidence that the verdict was tainted in any way by the comments of the witness, assuming that the jurors actually heard it. *Id.* at 578. The Supreme Court affirmed, noting that "the trial judge is usually in the better position to evaluate the circumstances of each case and the prejudicial effect, if any, of any claimed irregularity." *Id.* at 579.

Similarly, in *State v. Pratt*, 316 Or 561, 853 P2d 827 (1993), the defendant contended that an alternate juror made inappropriate comments to other jurors about testimony given during the trial and that the alternate juror had made inappropriate comments to the bailiff, out of the hearing of the rest of the jury, about the merits of the case. The trial court questioned jurors and determined that the alternate juror's comments did not introduce any prejudice to the jury's deliberations, because there was no evidence that the jury heard the comments. *Id.* at 574. The Supreme Court affirmed. Without addressing whether the alternate juror's

---

The Sixth Amendment to the United States Constitution provides that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury * * * [and] to be confronted with the witnesses against him[.]"

comments constituted. the sort of misconduct that could require the declaration of a mistrial, the court simply concluded that the trial court had not abused its discretion in determining that the alternate juror's remarks could not have caused any possible prejudice to defendant. *Id.* at 574-75.

In this case, there is little question that Eggers's disobedience of the court's instructions concerning contact with third parties could constitute contempt of court. Eggers took an oath to follow the instructions of the judge during the trial. The trial court explicitly instructed all jurors not to contact third persons concerning the trial and that failure to comply with that instruction could constitute contempt of court. Eggers's violation of that instruction was a violation of his oath and a serious breach of his obligations as a juror.

■ The question, then, is whether that misconduct had any prejudicial effect. In this case, the trial court took testimony from the jury foreperson and, on that basis, concluded that Eggers did not communicate with any of the other jurors about his contact with the individuals on the light rail and that his contact did not prejudice the jury's deliberations.[2] As in *Moore* and *Pratt*, we cannot say in this case that the trial court abused its discretion in reaching that conclusion.

Defendant insists that, at the very least, his federal constitutional claim of error must prevail. In support of that argument, defendant relies on *Parker v. Gladden*, 385 US 363, 87 S Ct 468, 17 L Ed 2d 420 (1966). In *Parker*, the bailiff in charge of the jury told one juror that the petitioner was "wicked" and guilty and told other jurors that, if anything was wrong with convicting the petitioner, the Supreme Court would correct it. *Id.* at 364-65. On the question whether the petitioner was prejudiced, the Court considered several factors. First, the Court noted that the improper statements were made by an official whose word "beyond question carries great weight with a jury he had been shepherding for eight days and nights." *Id.* at 365. Second, the Court considered that the jury had deliberated for 26 hours, "indicating a difference among them as to the guilt of petitioner." *Id.*

---

[2] Under ORS 136.450, ten jurors were required to concur in the verdict.

Finally, the Court noted that one of the jurors who had heard the remarks testified that she was prejudiced. *Id.* Thus, the Court agreed with the trial court's finding that the unauthorized contacts with the jury were prejudicial to the petitioner. *Id.*

■ By comparison, in this case, the remarks of the couple on the train were heard only by one juror, and the trial court made an explicit finding, not challenged on appeal, that the juror who heard the remark did not repeat it during deliberations. The couple on the train were not in any "official" position like the position of the bailiff in *Parker,* such that their comments would carry great weight with a juror. The jurors in *Parker* deliberated for 26 hours; the jurors in the present case deliberated for less than 30 minutes. Finally, none of the jurors in the present case complained of prejudice by the remark; in fact, eleven of them could not have been prejudiced, given that it was unknown to them. The trial court did not abuse its discretion in denying defendant's motion for a new trial.

Affirmed.